JAYME C. LONG (Bar No. 202867)
jayme.long@dentons.com
STEPHANIE PEATMAN (Bar No. 299577)
stephanie.peatman@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA  90017
Tel:  (213) 623-9300 / Fax:  (213) 623-9924

CHRISTOPHER M. WEIMER (Texas Bar No. 24061894)
*(Pro Hac Vice)*
cweimer@pirkeybarbar.com
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, TX  78702
Tel:  (512) 322-5200 / Fax:  (512) 322-5201

Attorneys for Plaintiff
3M COMPANY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| 3M COMPANY,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>THE PERFECT PART INC.<br><br>ADAM ZINKER,<br><br>CORY ZINKER.<br><br>　　　　　Defendants. | Case No. 2:20-cv-10540-JVS-JEM<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EX PARTE APPLICATION FOR:**<br><br>**(1) TEMPORARY RESTRAINING ORDER;**<br><br>**(2) ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION;**<br><br>**AND**<br><br>**(3) EXPEDITED DISCOVERY** |

1

Case No. 2:20-cv-10540-JVS-JEM
MEMORANDUM IN SUPPORT OF PLTF'S APP. FOR
TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................ 6

I.   COVID-19 and the Global Pandemic ......................................... 7

II.  The Parties and Their Products ................................................. 8

    A.   3M, the 3M Brand, and the Famous 3M Trademarks ............... 8

    B.   3M Personal Protective Equipment During the Pandemic ......... 9

    C.   Defendants' Sale of Counterfeit 3M Goods on eBay ............... 11

LEGAL STANDARD ................................................................ 12

ARGUMENT ............................................................................ 13

I.   3M Meets and Exceeds the Standard for a Temporary Restraining Order ... 14

    A.   3M Will Likely Succeed on the Merits ............................... 14

        1.   3M Can Show Trademark Counterfeiting and Infringement. .. 14

        2.   The 3M Marks are Valid and Incontestable. ..................... 15

        3.   Defendants' Use Is Counterfeiting and Is Likely to Cause Confusion. ... 15

        4.   3M is Likely to Prevail on its Additional Claims. .............. 18

    B.   3M Will Suffer Irreparable Harm Absent Immediate Relief ...... 19

    C.   The Balance of Hardships Weighs In 3M's Favor .................. 20

    D.   The Requested Relief Is in the Public's Interest ................... 21

II.  Preventing the Fraudulent Transfer of Assets is Critical ............... 21

III. 3M Is Entitled to Expedited Discovery ...................................... 23

IV.  3M Should Not Be Required to Post a Bond ............................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Christian Invs. LLC*,
    2012 WL 6561732 (E.D. Va. July 12, 2012) ...................................... 16

*3M Company v. Starsiak, et al.*,
    Civ. No. 20-cv-01314-SRN-DTS [Dkt. 37] (D. Minn. June 26, 2020) ............ 20

*Academy of Motion Picture Arts and Sciences v. Creative House
    Promotions, Inc.*,
    944 F.2d 1446 (9th Cir. 1991) ............................................... 17

*Align Tech., Inc. v. Strauss Diamond Instruments, Inc.*,
    No. 18-CV-06663-TSH, 2019 WL 1586776 (N.D. Cal. Apr. 12, 2019) ........... 25

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ............................................... 14

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir.1979) ................................................. 15

*Animale Grp. Inc. v. Sunny's Perfume Inc.*,
    256 F. App'x 707 (5th Cir. 2007) ............................................ 22

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ..................................... 15, 16, 17, 18

*Burberry Ltd. v. Euro Moda, Inc.*,
    2009 WL 1675080 (S.D.N.Y. June 10, 2009) .................................... 19

*Burger King Corp. v. Majeed*,
    805 F. Supp. 994 (S.D. Fla. 1992) ........................................... 21

*Chanel, Inc. v. Sunus Online Group, LLC*,
    2014 WL 12558780 (C.D. Cal. Jan. 15, 2014) .................................. 22

*Cisco Systems, Inc. v. Shenzhen Usource Tech. Co.*,
    No. 5:20-cv-04773-EJD, 2020 WL 5199434 (N.D. Cal. Aug. 7, 2020) 12, 16, 17

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003) ................................................ 25

*Cuviello v. City of Oakland*,
    No. C 06-05517 MHP EMC, 2007 WL 2349325 (N.D. Cal. Aug. 15,
    2007) ....................................................................... 25

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    924 F.Supp. 1559 (S.D.Cal.1996) *aff'd*, 109 F.3d 1394 (9th Cir. 1997) ........... 20

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*,
    344 F.Supp.2d 986 (S.D. Tex. 2004) ...................................... 23, 24

115931508\V-2

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) ............................................................ 16

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014) ...................................................... 13, 14

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) .................................................... 15, 16

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014) ........................................................ 22, 23

*Hand & Nail Harmony, Inc. v. ABC Nail and Spa Prods.*,
   No. SA-CV-160969-JEMX, 2016 WL 3545524 (C.D. Cal. June 28,
   2016) ..................................................................................................... 25

*Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ............................................................ 20

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
   738 F.3d 1085 (9th Cir. 2013) ............................................................ 17

*Johnson v. Macy*,
   145 F.Supp.3d 907 (C.D. Cal. 2015) .................................................. 12

*Krause Int'l Inc. v. Reed Elsevier, Inc.*,
   866 F. Supp. 585 (D.D.C. 1994) ........................................................ 20

*Lahoti v. VeriCheck, Inc.*,
   586 F.3d 1190 (9th Cir. 2009) ............................................................ 15

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
   51 F.3d 982 (11th Cir. 1995) .............................................................. 22

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
   658 F.3d 936 (9th Cir. 2011) .............................................................. 14

*Moroccanoil, Inc. v. Moroccan Gold, LLC*,
   590 F.Supp.2d 1271 (C.D.Cal.2008) .................................................. 21

*Nutri/System, Inc. v. Con–Stan Indus., Inc.*,
   809 F.2d 601 (9th Cir. 1987) .............................................................. 17

*OMG Fidelity, Inc. v. Sirius Technologies, Inc.*,
   239 F.R.D. 300 (N.D.N.Y. 2006) ....................................................... 24

*Pod-Ners, LLC v. Northern Feed & Bean of Lucerne Ltd. Liability Co.*,
   204 F.R.D. 675 (D. Colo. 2002) ......................................................... 23

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,
   970 F.2d 552 (9th Cir.1992) ............................................................... 22

*SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*,
   No. CV 15-08157-BRO, 2015 WL 6680807 (C.D. Cal. Oct. 19, 2015) 20, 21, 23

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
    208 F.R.D. 273 (N.D. Cal. 2002) .......................................................................23

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
    875 F.3d 426 (9th Cir. 2017) ................................................................... 17, 18

*Two Pesos, Inc. v. Taco Cabana. Inc.*,
    505 U.S. 763 (1992) ..........................................................................................18

*Winter v. Natural Res. Defense Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 13, 14

**Statutes**

15 U.S.C.
    § 1065 ........................................................................................................9, 15
    § 1114 ...............................................................................................................16
    § 1114(1)(a) ....................................................................................................14
    § 1115(b) ..........................................................................................................15
    § 1116(d)(1)(B) ...............................................................................................14
    § 1125(a) ..........................................................................................................18
    § 1125(c) ..........................................................................................................18
    § 1125(c)(1) .....................................................................................................19
    § 1127 ...............................................................................................................14

**Rules and Regulations**

Federal Rules of Civil Procedure
    Rule 26(d) .........................................................................................................23
    Rule 26(d)(1) ....................................................................................................23
    Rule 26(f) ..........................................................................................................23
    Rule 65 ..............................................................................................................12
    Rule 65(b)(1) ....................................................................................................20
    Rule 65(c) ..........................................................................................................24

42 C.F.R. Part 84 .........................................................................................................8

**Other Authorities**

8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal
    Practice and Procedure: Civil 2d § 2046.1 (West 1994) ...................................23

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

# **INTRODUCTION**

As the COVID-19 public health emergency enters its tenth month, demand for trustworthy personal protective equipment ("PPE") remains extraordinarily high. This is especially true for respirator products (often colloquially called "masks"), of which 3M's N95 respirators are perhaps the best-known and considered the "gold standard" in the industry. *See, e.g.*, https://www.startribune.com/3m-s-efforts-on-counterfeit-n95-mask-crackdown-leads-to-raids-in-vietnam-u-a-e/572638472/. As an industry-leading manufacturer of PPE, 3M has seen the demand and necessity of its products rise considerably in the face of the COVID-19 pandemic, with a particular focus on its N95 respirators, which significantly reduce the potential for transmission of airborne biological particles. 3M has drastically ramped up its production to meet this need. At the same time, 3M has not increased its U.S. prices for disposable N95 respirators as a result of the pandemic, despite increased demand and diminishing global supply.

Defendant The Perfect Part is an online seller who seeks to exploit the current COVID-19 pandemic by offering counterfeit 3M N95 respirator products online, typically at inflated prices. Defendants Adam Shachar Zinker and Cory Barak Zinker are officers and directors of Defendant The Perfect Part Inc. and appear to direct its day-to-day activities, including The Perfect Part's sale of counterfeit 3M products. Seeking to exploit and capitalize on this increased demand and scarcity, Defendants have been engaging in schemes to sell counterfeit 3M N95 respirators to the public, including through online e-commerce marketplaces like eBay. Defendants' counterfeiting activities are a prime example opportunistic pandemic profiteering: exploiting a public-health emergency for personal gain, at the public's expense.

Knowing that effective respirators are key to permitting healthcare professionals, first responders, and others to do their jobs while minimizing the potential for transmission of the novel coronavirus, Defendants and other counterfeiters misuse 3M's reputation, goodwill, and famous trademarks to deceive

Case No. 2:20-cv-10540-JVS-JEM
MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

consumers and sell fake products. This misconduct poses a serious and imminent threat to the health and safety of the consumers who believe they are buying and using genuine 3M N95 respirators that meet the N95 standard, when in fact the origin, quality, and efficacy of Defendants' counterfeit products are completely unknown. To make matters even worse, Defendants often sell their bogus products at inflated prices, meaning that duped consumers are made to pay more for fake product than they would for the genuine article from an authorized source.

In addition to the public health risk, Defendants' actions are further damaging 3M and its brand, which the public has come to rely on for high quality and effective PPE  Consumers purchasing 3M-branded products should be able to do so with the confidence that those products are of the quality and effectiveness that the public has come to expect and trust from 3M.

Defendants' misconduct needs to stop immediately. 3M respectfully requests that this Court enter a temporary restraining order to stop the incalculable harm to the general public and 3M that Defendants are actively causing through sale of counterfeit 3M goods.  Additionally, 3M seeks entry of temporary orders to restrict and freeze the assets in Defendants' payment account associated with their eBay seller account "theperfectpart" pending the outcome of this litigation.

## STATEMENT OF FACTS

### I.     COVID-19 and the Global Pandemic

Use of effective respiratory protection has emerged as a key tool in combatting the propagation of the highly contagious COVID-19 virus. Because the virus is believed to pass from person-to-person via respiratory droplets, current health and safety guidelines recommend that healthcare professionals and first responders wear respiratory protection, like 3M's N95 respirators, when interacting with infected or potentially infected patients. Such use is intended to minimize the risk of exposure to the virus, as authentic N95 respirators reduce exposure to airborne biological particles and liquid contamination when appropriately selected, fitted, and worn over

the nose and mouth. [Stobbe Decl ¶ 5.]. The 3M-branded N95 respirators are one of three respirator levels that meet the National Institute of Occupational Safety and Health standards for minimum filtration efficiency levels as prescribed by regulation 42 C.F.R. Part 84. [*See* Stobbe Decl ¶ 6.].

## II.     The Parties and Their Products

### A.     3M, the 3M Brand, and the Famous 3M Trademarks

For decades, 3M has been an industry-leading provider of scientific, technical, and marketing innovations across the globe. 3M's current portfolio includes more than 60,000 good and services, ranging from household and school supplies, to industrial and manufacturing materials, to medical supplies and equipment. [Gannon Decl. ¶ 4]. While 3M offers its goods and services under numerous well-known brands and marks, its most famous and widely recognized brand is its eponymous "3M" brand. [Gannon Decl. ¶ 5]. The 3M brand is associated with countless goods and services, including most notably for purposes of this litigation, medical devices, supplies, and PPE, including, for example, respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and many others. [Gannon Decl. ¶6]. As a result, 3M products are highly visible and well recognized in hospitals and other healthcare facilities where patients, healthcare providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand. [Gannon Decl. ¶6].

Over the past century, 3M has invested hundreds of millions of dollars advertising and promoting its 3M-branded products—including its N95 respirators—to consumers all over the world under the standard character mark ("3M") and the 3M logo shown below (together, the "3M Marks"):



Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

[Gannon Decl. ¶8–10].  In that time, products offered under the 3M Marks have enjoyed enormous commercial success, with billions of dollars in sales in 2019 alone, and have been the subject of widespread, unsolicited media coverage and critical acclaim.  [Gannon Decl. ¶¶8– 10.]

As the result of 3M's marketing and promotion of its 3M Marks, and the critical and commercial success of products and services bearing the mark, 3M has developed substantial goodwill in the 3M Marks.  Consumers associate the 3M Marks uniquely with 3M and recognize them as identifying 3M as the exclusive source of goods and services offered under the 3M Marks.  The 3M Marks have also become famous among consumers in Minnesota and throughout the United States. [Gannon Decl. ¶¶ 8–10.]

In addition to the strong common-law trademark rights that 3M has developed in the 3M Marks, 3M has also obtained numerous federal trademark registrations for the 3M Marks, including but not limited to U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, inter alia, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No. 2,692,036, which covers the 3M logo for, inter alia, a "full line of surgical masks, face shields, and respiratory masks for medical purposes" (the "'036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, inter alia, respirators (the "'534 Registration"). [Gannon Decl. ¶11– 17].  Additionally, each of the listed registrations is "incontestable" pursuant to 15 U.S.C. § 1065, meaning that the registrations themselves constitute conclusive evidence of (i) 3M's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) 3M's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.

**B.    3M Personal Protective Equipment During the Pandemic**

3M has been committed to getting personal protective equipment, including 3M-branded N95 respirators, to medical professionals and first responders around

Case No. 2:20-cv-10540-JVS-JEM
MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

the world as they place their health and safety on the line to confront the COVID-19 pandemic. [Stobbe Decl. ¶8].  Authentic, effective N95 respirators are critical in this fight: 3M's N95 respirators can help prevent virus-carrying particles from reaching the wearer when appropriately selected, fitted, and worn over the mouth and nose. [Stobbe Decl. ¶5.].

As the pandemic continues unabated, demand for N95 respirators has exploded. 3M has worked tirelessly to produce and supply healthcare workers and first responders with millions of 3M-branded N95 respirators. [Stobbe Decl. ¶7.] Beginning in January 2020, 3M began increasing its production of 3M-branded respirators, doubling its global output to a rate of 1.1 billion per year, or 100 million per month. [Stobbe Decl. ¶8]. 3M has also been investing in the capital and resources to enable it to double its respirator production capacity once again, to two billion globally before the end of 2020. [Stobbe Decl. ¶8]. In the U.S., significant quantities of 3M's respirators have gone to healthcare and public health users, with additional respirators. [Stobbe Decl. ¶ 9.] In addition to ramping up production of its 3M-branded respirators to meet increasing demand, 3M has also committed to not increasing its U.S. prices for disposable N95 respirators as a result of the pandemic, so that the public can obtain this critically necessary equipment at non-inflated prices. [Stobbe Decl. ¶10.]

Unfortunately, with the increase in demand and the short-term strain on supply, a number of wrongdoers have sought to exploit the current public health emergency and prey on vulnerable parties through a variety of scams and schemes involving 3M N95 respirators and other 3M PPE products.  These schemes include practices such as price gouging, fake offers, counterfeiting, and other unfair and deceptive practices, all of which undermine the public's confidence in the marketplace and constitute an ongoing threat to public health and safety. [Stobbe Decl. ¶11.]

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

3M has been committed to confronting these unscrupulous parties head on and combating these activities. 3M has worked closely with law enforcement all over the world, including the U.S. Department of Justice, state Attorneys General, the FBI, and local authorities to stop and prevent price-gouging, counterfeiting, and other unlawful activity. [Stobbe Decl. ¶12–14.]

Among its public-facing efforts to combat unfair practices, 3M has created a website (*see* www.3m.com/covidfraud) and a "3M COVID-19 Fraud Hotline" for the public to use to get information and report potential cases of fraud, price gouging, and counterfeit activities. 3M has received reports of fraudulent and counterfeit sales, including by Defendants, through its COVID-19 Fraud Hotline. [Stobbe Decl. ¶12–14.] Moreover, 3M publishes information on its website about its anti-price-gouging and counterfeiting efforts, including disclosure of 3M's list prices for its N95 respirators so that customers can identify and avoid inflated prices, and the web address and phone numbers that can be used to identify 3M authorized distributors and dealers in the United States and Canada. [Stobbe Decl. ¶12–13.]

Further, 3M has filed more than twenty lawsuits in courts—including this action—in its fight against fraud, price gouging, and counterfeiting. 3M has secured numerous temporary restraining orders and preliminary injunction orders from courts across the country that put a stop to other defendants' unlawful and unethical profiteering from the pandemic. [Stobbe Decl. ¶14.]

## C.     Defendants' Sale of Counterfeit 3M Goods on eBay

Recently, 3M learned of Defendants' online sales of counterfeit 3M products. From 3M's review of the relevant product listings and products purchased from Defendants directly by or on behalf of 3M, 3M has determined that Defendants are offering counterfeit goods bearing the 3M Marks. [Gannon Decl. ¶ 21.] True and correct copies of screenshots showing Defendants' counterfeit product offerings are attached as Exhibit 8 to the Complaint [Dkt. No. 10.] and with this Memorandum. [Gannon Decl. ¶ 23-25.]

Case No. 2:20-cv-10540-JVS-JEM
MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

The counterfeit 3M products sold by Defendants are being offered and sold at prices that are 6-7 times higher than those charged by 3M for genuine products, indicating Defendants' clear intent to profit during this pandemic at the expense of the public. [Gannon Decl. ¶25.] Additionally, Defendants appear to offer some genuine 3M products through eBay, but many of these products are also sold at prices significantly higher than the price of genuine goods sold by 3M or its authorized distributors. [Gannon Decl. ¶25–26.]

3M has not provided any authorization or license to Defendants to use the 3M Marks in connection with their advertisement, marketing, sale, distribution and/or shipment of 3M products, much less counterfeit 3M products. [Gannon Decl. ¶ 27.]. Based on the fact that The Perfect Part claims to be "based in Los Angeles," ships counterfeit products from this District, and sells counterfeit products from (and presumably into) this District using "theperfectpart" eBay seller page, Defendants are intentionally, knowingly and willfully using the 3M Marks in connection with advertisement, marketing, sale, distribution and/or shipment of counterfeit 3M products into the United States and California by means of interactive Internet websites. [Gannon Decl. ¶ 29]]

Online counterfeiters employ several tactics to evade enforcement efforts, such as registering new usernames or aliases upon receiving notification of claimed infringement or the filing of a lawsuit, as well as shipping small quantities of counterfeit product directly by mail, hoping to evade detection. [Gannon Decl. ¶ 30]

## LEGAL STANDARD

The standards for a temporary restraining order and preliminary injunction are the same.  *See Johnson v. Macy*, 145 F.Supp.3d 907, 913 (C.D. Cal. 2015). Under Rule 65 of the Federal Rules of Civil Procedure, such preliminary relief is appropriate when the movant establishes: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of the requested relief; (3) the balance of the hardship tipping in its favor; and (4) that its request is in the public interest. *Cisco*

*Systems, Inc. v. Shenzhen Usource Tech. Co.*, No. 5:20-cv-04773-EJD, 2020 WL 5199434, at *6 (N.D. Cal. Aug. 7, 2020) (citing *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014).

## **ARGUMENT**

The Court should enter a temporary restraining order to stop Defendants from using 3M's famous marks to sell counterfeit goods to the public.  There can be no doubt that 3M will succeed on the merits of its claims given the brazen misuse of 3M's trademarks by Defendants to sell their fake goods.  Additionally, the harm to the public, as well as to 3M's goodwill and reputation, is urgent and ongoing, and it is irreparable absent immediate relief, especially during this critical time in a global pandemic where the failure or inefficacy of one of the counterfeit 3M N95 respirators offered by Defendants could mistakenly be imputed to 3M, and could put the user of such a counterfeit product at immediate risk of COVID-19 exposure.  The balance of hardships indisputably weighs in 3M's favor, as Defendants suffer no legitimate hardship from being prevented from continuing to perpetrate their illegal schemes through the sale of counterfeit 3M products, often at inflated prices.  And finally, the public interest is certainly served by stopping Defendants' counterfeiting operations, not only to prevent confusion and deception as to source or affiliation caused by the unauthorized use of 3M's trademarks, but also to protect the public from Defendants' products themselves, which are of unknown origin, quality, and efficacy.

Additionally, this Court should enter an order directing eBay to restrain any assets in any payment accounts associated with Defendants' seller account "theperfectpart" to prevent them from dissipating such assets or hiding them beyond

Case No. 2:20-cv-10540-JVS-JEM
MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

the reach of any potential order for recovery while this litigation remains pending. An order for expedited discovery is also warranted to allow 3M to identify the full scope of Defendants' counterfeiting scheme (including identifying any additional counterfeit products), ascertain the source of Defendants' counterfeit goods, and determine whether Defendants' operate any other online seller identities offering counterfeit goods. This early relief will help to ensure that further harm caused by Defendants' counterfeit sales is prevented and that the temporary restraining order and any other relief that is granted in this proceeding is given meaningful effect.

**III.   3M Meets and Exceeds the Standard for a Temporary Restraining Order**

    **A.   3M Will Likely Succeed on the Merits**

To obtain a temporary restraining order and preliminary injunction, 3M must show that it is likely to succeed on the merits of one of its claims. *Winter,* 555 U.S. at 20.  However, if the balance of hardships weighs heavily in favor of 3M and the other two *Winter* factors are met, 3M need only establish that "there are serious questions going to the merits—a lesser showing than likelihood of success on the merits. . . ." *Friends of the Wild Swan*, 767 F.3d at 942; *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).

    **1.   3M Can Show Trademark Counterfeiting and Infringement.**

Here, 3M can plainly demonstrate it will prevail on the merits of its counterfeiting and trademark infringement claims. The Lanham Act creates civil liability for persons who, without a registrant's consent, "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). A counterfeit mark is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; *see also* 15 U.S.C. § 1116(d)(1)(B); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 946 (9th Cir. 2011)

115931508\V-2

(defining counterfeit mark as a "(1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark.").

To prevail on its claims for trademark infringement and unfair competition, 3M must show that it "owns a valid mark" and that Defendants' "use of the mark is likely to cause confusion, or to cause mistake, or to deceive." *See Lahoti v. VeriCheck, Inc.,* 586 F.3d 1190, 1196 (9th Cir. 2009).

Courts in the Ninth Circuit assess the following *Sleekcraft* factors to evaluate likelihood of confusion: (1) the similarity of the marks; (2) the relatedness of the goods; (3) the marketing channel used; (4) the strength of the plaintiff's mark; (5) the defendant's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (*citing AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir.1979)). Those elements are satisfied here.

## 2.      The 3M Marks are Valid and Incontestable.

There can be no question as to the validity of 3M's trademark registrations and rights appurtenant thereto. The 3M Marks in question are valid and incontestable, and the certificates for the '329, '036, and '534 Registrations serve as conclusive evidence of the validity of the 3M Marks. See 15 U.S.C. § 1115(b); 15 U.S.C. § 1065; *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp*., 174 F.3d 1036, 1048 (9th Cir. 1999) (recognizing that the "validity and legal protectability" of an incontestable trademark are "conclusively presumed.").

## 3.      Defendants' Use Is Counterfeiting and Is Likely to Cause Confusion.

Here, 3M submits evidence to the Court that the goods offered by Defendants are not genuine, and bear reproductions of the 3M mark without authorization. In other words, they are counterfeit. This evidence is sufficient, by itself, to establish

liability and likelihood of success on the merits under Section 1114. *See Cisco Systems,* 2020 WL 5199434, at \*7 ("As Cisco has shown that this is a clear case of counterfeiting, including the use of identical marks in connection with, supposedly, the same goods, there is a likelihood of confusion as a matter of law.").

The 3M Marks are not only conceptually strong—i.e., arbitrary or fanciful when applied to respirator products—they are also extraordinarily strong commercially. 3M has spent millions of dollars in advertising, marketing, and promoting goods and services under the 3M Marks; goods sold under the 3M Marks, including 3M's N95 respirators, generate billions of dollars in annual revenue; the 3M Marks are recognized and well-known in households around the U.S.; and 3M has been the exclusive source of goods and services offered under the 3M Marks for many decades. There is no question that the 3M Marks are commercially strong. As one would expect, courts throughout the country have agreed—including specifically finding that the 3M Marks are strong in connection with respirators. *See Performance Supply*, 2020 WL 2115070, at \*9; *see also 3M Co. v. Christian Invs. LLC*, 2012 WL 6561732, at \*9 (E.D. Va. July 12, 2012).

With regard to the similarity of the marks and the goods at issue, Defendants entirely reproduce the 3M mark in connection with products 3M also offers. In other words, the marks and goods at issue are identical. Consequently, these factors strongly favor 3M. *See e.g., GoTo.com*, 202 F.3d at 1206 ("Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion."); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147 (9th Cir. 2002) ("[T]he more closely related the goods are, the more likely consumers will be confused by similar marks."). Where identical marks are used for the same goods or services, courts have not only held that this factor favors the plaintiff, but also that "likelihood of confusion. . .follow[s] as a matter of course." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1056 (9th Cir.1999); *Cisco Systems,* 2020 WL 5199434, at \*7 (same).

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP. FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

With regard to Defendants' intent, evidence of intent to deceive the public is not a requirement to prevail on an otherwise valid infringement claim, but such evidence strongly supports a likelihood of confusion. *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 434 (9th Cir. 2017) ("When the alleged infringer intend[s] to deceive customers, we infer that its conscious attempt to confuse did in fact result in confusion."). The Ninth Circuit has held that "choosing a designation with knowledge that it is another's trademark permits a presumption of intent to deceive." *Id.* (*citing Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1096 (9th Cir. 2013)); *Cisco Systems,* 2020 WL 5199434, at *7 ("And the use of identical marks and trade names to sell counterfeit products shows that Defendants intend to copy them and confuse the public"). Here, Defendants are intentionally using the 3M Marks to confuse and deceive the consuming public into thinking that Defendants' counterfeit 3M-branded products are manufactured by or emanate from 3M itself. Accordingly, this factor weighs in 3M's favor.

Actual confusion evidence is not necessary to prevail on a trademark infringement claim. *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991); *see also Brookfield*, 174 F.3d at 1050 ("The failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."). In this case, however, customer reviews posted online at Defendants' seller pages for product listings that 3M has identified as counterfeit show evidence of actual confusion, with customers believing they have purchased genuine 3M products. *See* Exhibit 8 to Complaint; [Gannon Decl. ¶ 25].  This factor therefore also favors 3M.

Advertising, the existence of direct competition, and retail distribution are considered when addressing whether the parties use similar marketing channels. *See e.g., Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987). Here, Defendants are selling counterfeit 3M products in direct competition with

3M's genuine products. Further, both 3M and Defendants advertise 3M respirators online, and 3M's authorized distributors sell online just as Defendants do. [*See* Gannon Decl. ¶ 34.] Consequently, this factor also favors 3M.

Finally, with respect to the sophistication of the consumers, the Ninth Circuit has recognized that "where the marks and goods are identical . . . even the trained eye will not be able to discern any difference." *Stone Creek*, 875 F.3d at 435. Here, there is widespread demand for the type of product at issue—i.e., respirators, including by many individuals who have never purchased respirators and are thus unlikely to be particularly sophisticated in purchasing the product. *See Brookfield*, 174 F.3d at 1060 (recognizing confusion would be less when the products are "marketed primarily to expert buyers"). Although 3M has not increased its U.S. prices for such products, counterfeiters nonetheless take advantage of the high demand and relative scarcity to charge higher prices, knowing the public will pay them.   In the context of online sales, where the customer has no meaningful opportunity to personally inspect the product to be shipped, the conditions of purchase exacerbate the potential for confusion.  This factor therefore favors 3M's position and the grant of injunctive relief.

### 4.    3M is Likely to Prevail on its Additional Claims.

In addition to claims of trademark counterfeiting and trademark infringement, 3M seeks relief against Defendants for false designation of origin under 15 U.S.C. § 1125(a), trademark dilution under 15 U.S.C. § 1125(c), and corollary claims under California law.  3M is equally likely to succeed on the merits of these claims.

3M is likely to prevail on its claim for false designation of origin. The relevant inquiry in a false designation of origin claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), aligns with the relevant inquiry for whether the public is likely to be deceived or confused by the similarity of the marks at issue, described above. *See generally Two Pesos, Inc. v. Taco Cabana. Inc.*, 505 U.S. 763, 780, (1992). Because 3M can demonstrate a likelihood of success on the merits of its trademark

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

counterfeiting and infringement claims, 3M is equally likely to succeed on its claims for federal false designation of origin.

Similarly, 3M is likely to prevail on its claim for trademark dilution. Section 43(c) of the Lanham Act states in part that:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). Here, Defendants' use of an identical "3M" mark long after the 3M Marks became famous, threatens to undermine the strength and selling power of the famous 3M Marks. In addition, some courts have upheld dilution by tarnishment claims based on the sale of inferior counterfeit goods offered under an identical mark, providing 3M yet another avenue for likely success on the merits of its claims. *E.g., Burberry Ltd. v. Euro Moda, Inc.*, 2009 WL 1675080, at *15 (S.D.N.Y. June 10, 2009).

## B.    3M Will Suffer Irreparable Harm Absent Immediate Relief

3M will be irreparably harmed if Defendants' sale of counterfeit 3M goods is left unchecked. Here, the likelihood of irreparable harm is established by the fact that the counterfeit products at issue are critical health products needed to reduce the transmission of the COVID-19 virus, and Defendants' counterfeit products are likely less effective at doing so. This creates an enormous and imminent risk to the health and safety of those who purchase and use Defendants' counterfeit products, which is both irreparable and incalculable. In addition, the potential damage to 3M's reputation and goodwill, along with the possibility of customer diversion and

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

disappointment from receiving potentially inferior imitation products during a time of great need, also creates a threat of irreparable harm. Defendants' price-gouging of consumers similarly constitutes irreparable harm to 3M's reputation, as consumers are likely to blame 3M for the high prices charged by Defendants. Consumers commenting on the same counterfeit listing have already complained of price gouging, claiming that the products are a "rip off."  *See* Exhibit 8 to Complaint; [Gannon Decl. ¶25].

They are precisely the type of injuries that warrant an immediate halt to Defendants' infringing activities through injunctive relief. *See e.g., Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc*., 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm.") In similar contexts, courts in this and other Districts have granted injunctive relief, particularly where counterfeiting was at issue. *E.g.*, *SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*, No. CV 15-08157-BRO, 2015 WL 6680807 (C.D. Cal. Oct. 19, 2015) (granting TRO against counterfeit use of registered mark); *see also 3M Company v. Starsiak, et al.*, Civ. No. 20-cv-01314-SRN-DTS [Dkt. 37] (D. Minn. June 26, 2020) (granting a TRO for misuse of the 3M mark in connection with the offer of respirators). Both 3M and the public will suffer immediate and irreparable injury, loss, or damage if an ex parte Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1). [Stobbie Decl. ¶ 15.]

## C.   The Balance of Hardships Weighs In 3M's Favor

Defendants are willful counterfeiters; enjoining them from activities that are already unlawful cannot be considered a hardship. *See, e.g.*, *Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994) ("When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner."); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 924 F.Supp. 1559, 1574 (S.D.Cal.1996) *aff'd*, 109 F.3d 1394 (9th Cir. 1997)

115931508\V-2

("[W]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration."); *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992) ("One who adopts the marks of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived.") (internal quotations omitted). To date, Defendants have been profiting from the sale of counterfeit 3M-branded N95 respirators. In contrast, 3M and the public have been harmed by Defendants sale of counterfeit 3M products (typically at inflated prices) that may provide inadequate protection against COVID-19. Unless and until enjoined, Defendants' conduct will continue to cause ongoing harm to 3M's rights.

### D.     The Requested Relief Is in the Public's Interest

The public has a strong interest in being protected from fraud and deceit in the purchase of PPE. Defendants' fraudulent sales of these counterfeit respirators jeopardizes the health and safety of healthcare workers, first responders, and the public who believe they are purchasing genuine 3M N95 respirators that meet the N95 standard. While 3M N95 respirators are subject to strict quality control standards, the products offered by Defendants are of unknown provenance: the public has no way of knowing who is making them, with what materials, and with what (if any) quality control and health safety measures. This unlawful activity poses potentially serious health consequences for the public, justifying immediate judicial intervention. Indeed, the public's "right 'not to be deceived or confused'" is at the core of serving the public interest. *SATA*, 2015 WL 6680807, at *9 (*citing Moroccanoil, Inc. v. Moroccan Gold, LLC,* 590 F.Supp.2d 1271, 1282 (C.D.Cal.2008)).

### IV.     Preventing the Fraudulent Transfer of Assets is Critical

Among other remedies, 3M seeks recovery of Defendants' profits from their wrongful use of the 3M Marks in connection with sales of counterfeit PPE. The

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

Court is authorized to freeze Defendants' assets under its equitable powers. Several Courts of Appeal, including the Ninth Circuit, have found that freezing assets is a warranted remedy to preserve the possibility of recovery in counterfeiting cases. *See, e.g.*, *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.,* 970 F.2d 552, 562 (9th Cir.1992) ("Because the Lanham Act authorizes the district court to grant [Plaintiff] an accounting of [Defendant's] profits as a form of final equitable relief, the district court had the inherent power to freeze [Defendant's] assets in order to ensure the availability of that final relief."); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987–88 (11th Cir. 1995) (affirming preliminary injunction freezing assets of U.S.-based defendants who arranged for making counterfeit Levi's jeans); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132–33 (2d Cir. 2014) (confirming trial court could issue TRO and preliminary injunction freezing assets of defendants alleged to be selling counterfeit goods online); *Animale Grp. Inc. v. Sunny's Perfume Inc*., 256 F. App'x 707, 709 (5th Cir. 2007) (affirming TRO and preliminary injunction freezing assets of defendants selling counterfeit goods).

This action involves blatant unauthorized use of the 3M Marks by Defendants, in their advertising for PPE and on the packaging for such product. Given this blatant infringement, it is likely that Defendants can and would dissipate their assets during the pendency of this case if given the opportunity to do so. *Chanel, Inc. v. Sunus Online Group, LLC*, 2014 WL 12558780, at *3 (C.D. Cal. Jan. 15, 2014) ("[B]ased on Defendants' blatant violations of trademark laws there is likelihood that Defendants would transfer or hide the illegally obtained assets in order to avoid a judgment in this action . . . ").[1]

The Court's authority to freeze assets extends to banks and other non-parties that have custody of Defendants' assets or provide payment services to Defendants. *See, e.g.*, *Reebok*, 737 F. Supp. at 1527–28 (issuing a TRO and preliminary

---

[1] 3M would donate any recovery from this action to charitable COVID-19 relief efforts.

115931508\V-2

injunction stating that "any banks, savings and loan associations, or other financial institutions ... who receive actual notice of this order by personal service or otherwise, are preliminarily enjoined from transferring, disposing of, or secreting any money, stocks or other assets of these defendants, until further order of the court"); *Gucci Am., Inc.*, 768 F.3d at 133 (rejecting argument that plaintiff had to identify particular property derived from counterfeiting before obtaining TRO and preliminary injunction freezing all assets).

## V.     3M Is Entitled to Expedited Discovery

As a default under Rule 26(d)(1) of the Federal Rules of Civil Procedure, a party may not seek discovery from any source before the parties have met and conferred as required by Rule 26(f). The Federal Rules also provide exceptions to that general rule, however, where expedited discovery is warranted, for good cause shown. "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *SATA*, 2015 WL 6680807, at *11 (C.D. Cal. 2015) (*citing Semitool, Inc. v. Tokyo Electron Am., Inc.,* 208 F.R.D. 273, 276 (N.D. Cal. 2002)); s*ee also El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F.Supp.2d 986, 991 (S.D. Tex. 2004) (citing 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil 2d § 2046.1 (West 1994)) ("A court should only issue an order for expedited discovery if there is some showing of good cause to justify the order."); *Pod-Ners, LLC v. Northern Feed & Bean of Lucerne Ltd. Liability Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002) ("Rule 26(d), Fed.R.Civ.P., allows [the court] to order expedited discovery upon a showing of good cause.").

Here, good cause exists to grant 3M's request for expedited discovery. The information 3M seeks to uncover through expedited discovery is necessary for 3M to trace the source of Defendants' counterfeit goods and identify whether Defendants have any other counterfeit online listings or seller identities offering counterfeit goods. *See, e.g.*, *SATA*, 2015 WL 6680807, at *11 (C.D. Cal. 2015) (granting request

for expedited discovery to determine source of counterfeit goods and prevent additional counterfeit sales).

Further, information sought in expedited discovery would assist 3M in its pursuit of a preliminary injunction. *See El Pollo Loco, S.A. de C.V.*, 344 F.Supp.2d 986, 991 (S.D. Tex. 2004) ("An order for expedited discovery would be appropriate in a case seeking a preliminary injunction."). *See also OMG Fidelity, Inc. v. Sirius Technologies, Inc.*, 239 F.R.D. 300, 305 (N.D.N.Y. 2006) ("... particularly given that plaintiff contemplates a motion for a preliminary injunction, depending upon the results of its proposed discovery efforts, it is clear that plaintiff will potentially be unfairly prejudiced should [the court] not permit discovery to go forward since it will not have an early opportunity to develop evidence for use in support of such a motion.").

The discovery sought will not prejudice defendants. The expedited discovery at issue is intended solely to prevent Defendants from continuing their infringing scheme, which poses an immediate and substantial risk to the public. Further, the expedited discovery seeks only information that Defendants would already be obligated to provide during this litigation. Any prejudice to Defendants in performing this discovery in an expedited fashion is outweighed by the risk to the public and 3M if Defendants' infringement continues.

## VI.   3M Should Not Be Required to Post a Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

3M should not be required to post bond for the relief sought here.  3M is not seeking an injunction against legitimate business competitors; it is seeking to prevent fraudulent counterfeiting operations. Defendants have no recognizable financial

1   interest in their schemes, and a bond is not required where no damages would result

2   from the wrongful issuance of an injunction. *See Connecticut Gen. Life Ins. Co. v.*

3   *New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir. 2003) (""The district court

4   is afforded wide discretion in setting the amount of the bond, ... and the bond amount

5   may be zero if there is no evidence the party will suffer damages from the

6   injunction."); *Align Tech., Inc. v. Strauss Diamond Instruments, Inc*., No. 18-CV-

7   06663-TSH, 2019 WL 1586776, at *17 (N.D. Cal. Apr. 12, 2019) ("The district court

8   may dispense with the filing of a bond when it concludes there is no realistic

9   likelihood of harm to the defendant from enjoining his or her conduct."); *Cuviello v.*

10  *City of Oakland*, No. C 06-05517 MHP EMC, 2007 WL 2349325, at *8 (N.D. Cal.

11  Aug. 15, 2007) (recommending no bond be required in part because there was no

12  proof of likelihood of harm to the party enjoined). Should the Court decide in its

13  discretion that a bond should be required, the circumstances of this case would

14  require only a modest bond. *See e.g.*, *Hand & Nail Harmony, Inc. v. ABC Nail and*

15  *Spa Prods.*, No. SA-CV-160969-JEMX, 2016 WL 3545524, at *8 (C.D. Cal. June

16  28, 2016) ("[H]aving considered the record, the Court finds a $5,000.00 bond is

17  sufficient….").

18  **VII.   Compliance with L.R. 7-19.**

19          Counsel for 3M submits herewith the Declaration of Christopher M. Weimer

20  regarding 3M's efforts to provide actual notice to Defendants of 3M's request for a

21  temporary restraining order.  No known counsel for Defendants exists in connection

22  with this matter.

23

24

25

26

27

28

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2

1 | Dated: November 24, 2020

Respectfully submitted,

2

DENTONS US LLP
Jayme C. Long
Stephanie Peatman

3

4

PIRKEY BARBER PLLC
Christopher M. Weimer

5

6

By: */s/ Christopher M. Weimer*

7

Christopher M. Weimer

8

Attorneys for Plaintiff
**3M COMPANY**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:20-cv-10540-JVS-JEM

MEMORANDUM IN SUPPORT OF PLTF'S EX PARTE APP.
FOR TEMPORARY RESTRAINING ORDER, ETC.

115931508\V-2